**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **PARKER HANNIFIN CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05-1041 T** |
| **v.** | ) | **The Honorable Thomas C. Wheeler** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S SUR-REPLY TO THE REPLY OF THE UNITED STATES IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT FOR LACK OF JURISDICTION**

A. Statement of Facts.

In its Motion to Dismiss, the Defendant argued that Plaintiff failed to file a proper administrative claim for refund, as required by 26 U.S.C. § 7422(a), because it did not file its claim within two years of February 5, 1999 – the date on which Defendant alleged that the credit from Plaintiff's 1988 tax year was applied as a payment to Plaintiff's 1987 tax year. *See* pages 2 and 3 of Defendant's Motion to Dismiss. As will be explained below, however, Defendant has now abruptly changed its position and asserts that February 22, 1999 is the relevant payment date. Defendant has not provided an explanation as to why its former position is now incorrect.

Plaintiff's position is that its February 23, 2001 letter (Exhibit A-12 to Plaintiff's Complaint) merely provided more detailed information to supplement its May 26, 2000 refund claim – which both parties agree was timely filed. Accordingly, all of the information is part of one timely filed claim (May 26, 2000) and it becomes irrelevant that the Defendant now has changed its position as to what is the applicable payment date. Alternatively, Plaintiff asserts (as it did in its Memorandum in Opposition to Defendant's Motion to Dismiss) that the 1988 credit

was applied as a payment to the 1987 tax deficiency on March 1, 1999, so that Plaintiff's February 23, 2001 filing was within the two-year period.

Defendant, in its Motion to Dismiss, acknowledged that "[t]he date of the credit made to the 1987 account is considered the payment date." Defendant's Motion to Dismiss at page 5, footnote 4. The Defendant relied on two cases for this position: *Republic Petroleum Corp. v. United States*, 613 F.2d 581 (5th Cir. 1980) and *Simmons v. United States*, 29 Fed. Cl. 136 (1993). The court in *Republic Petroleum* found that "A tax is deemed to be paid if a cash credit of the taxpayer is charged against a determined assessment or if an overpayment of one year is credited against a deficiency of another year. 613 F.2d at 525. The court, in footnote 16 of the opinion, explains that it is the application of taxpayer's overpayments to satisfy his liability for another year that constitutes payment for the other year. 613 F.2d at 525. The Defendant's position is based on the sound reasoning of the Fifth Circuit's opinion in *Republic Petroleum*, and the authorities cited by Defendant actually support Plaintiff's position that the critical date is the date of the crediting of the payment from the overpayment year (1988) to the tax deficiency year (1987).

In its Reply dated April 26, 2006, Defendant now has shifted its position and concedes that February 5, 1999 is not the date on which the 1988 overpayment credit was applied as a payment to the 1987 tax year but, rather, that February 22, 1999 is the correct payment date. Additionally, in its Reply dated April 26, 2001, the Defendant also acknowledges that the Plaintiff supplemented its claim, with respect to the deficiency interest, on February 23, 2001.

Based on Defendant's revised position that the correct payment date is February 22, 1999, Defendant now asserts for the first time that Plaintiff's refund claim (as supplemented by its February 23, 2001 letter) was not timely filed because the claim was not filed within two years of

February 22, 1999. Plaintiff disagrees with Defendant's new position and submits that Plaintiff's filing on February 23, 1999 supplemented its timely filed refund claim dated May 26, 2000. Alternatively, Plaintiff asserts (and has always asserted) that the correct payment date was March 1, 1999, not February 22, 1999. Therefore, Plaintiff's supplemental filing on February 23, 2001, if treated as a separate refund claim, was timely filed.

B. Plaintiff's February 23, 2001 letter merely supplemented its May 26, 2000 refund claim, and the doctrine of substantial variance does not apply.

Defendant continues to erroneously assert that the doctrine of substantial variance applies in this case. Specifically, beginning at page 10 of its Reply, Defendant argues that Plaintiff's February 23, 2001 letter was not a timely amendment of its timely filed May 26, 2000 refund claim, and that the February 23, 2001 letter was not "germane" to the May 26, 2000 refund claim. Plaintiff disagrees with Defendant.

Both parties are in agreement that the May 26, 2000 refund claim was timely filed. A careful comparison of the May 26, 2000 refund claim to the February 23, 2001 letter shows that the February 23, 2001 letter merely provided further detail for the information already set forth in the May 26, 2000 refund claim. As stated in the February 23, 2001 letter:

> The credit elect worksheet (version one) that accompanied our refund claim (letter) May 26, 2000, is consistent with the current IRS procedures and recent Field Service Advice memoranda, but does not contain detailed information regarding (1) at what point each of the credit elect overpayment amounts were actually effective as a payment against a liability for a subsequent tax year(s), (2) the estimated tax account balance as of the end of each quarterly period, or (3) interest-free refunds received by PHC with respect to originally filed returns.
>
> The revised worksheets [submitted as part of this February 23, 2001 letter] show precisely when and how PHC satisfied each of its estimated tax and income tax return liabilities. The worksheets also show the beginning and ending dates of the time periods during which PHC had overpaid its liabilities (during which periods the government would be considered to have use of PHC's funds) and the extent (*i.e.* amounts) of such overpayments.

Because the February 23, 2001 letter only supplemented the information provided in the timely May 26, 2000 refund claim, all of the information comprises one timely refund claim.

Even if Defendant were correct that February 22, 1999 was the date on which the credit from Plaintiff's 1988 tax year was applied as a payment to Plaintiff's 1987 tax year, Plaintiff's February 23, 2001 letter would still be a valid amendment to its May 26, 2000 refund claim because, as shown above, the information in the February 23, 2001 letter is "germane" to the May 26, 2000 refund claim.

Defendant asserts that the May 26, 2000 letter and the February 23, 2001 letter present different issues because, according to Defendant, the former is predicated on the *May Department Stores* case, which the taxpayer won, and the later is predicated on the *Fleetboston Financial Corporation* case, which the Government won. According to the Defendant, the differing results in these cases prove that the issues were different.

Plaintiff disagrees with Defendant's logic and submits that Defendant has failed to focus on the test set forth by the United States Supreme Court in *United States v. Andrews*, 302 U.S. 517 (1938), cited by Plaintiff at page 10 of its Memorandum in Opposition to Defendant's Motion to Dismiss. Central to the *Andrews* test is the principle that "an amendment which merely makes more definite the matters already within [the Commissioner's] knowledge, or which, in the course of his investigation, he would naturally have ascertained, is permissible." 302 U.S. at 524. The information provided in Plaintiff's February 23, 2001 letter is Plaintiff's tax transcript information that was in the IRS's possession and readily available to the IRS in its own electronic transcripts; Plaintiff merely extracted this information and presented it for the IRS's convenience. Accordingly, this is information that the IRS would have necessarily

discovered in the course of its investigation of the May 26, 2000 refund claim as it applied "use of money principles."

Moreover, Defendant cannot complaint it was prejudiced or not on notice of the information provided by the Plaintiff in its February 23, 2001 letter because the information was already in the possession of the IRS, and it was provided to the IRS and considered by the IRS before it disallowed Plaintiff's refund claim by letter dated November 20, 2001 (*See* Exhibit B-1 of Complaint).

Finally, Defendant complains about the amount of Plaintiff's refund of $3.6 million. However, the mere fact that there is a difference in the amount of its deficiency interest at issue does not create a variance. See Plaintiff's Memorandum in Opposition at page 11.

C. The relevant payment date is March 1, 1999, because this is the date that the IRS took the final action of posting the overpayment credit from Plaintiff's 1988 tax year to its deficiency for the 1987 tax year.

The rationale for the Defendant's position (that February 22, 1999 is the payment date) lies in its interpretation of 26 USC § 7422(d) and 26 USC § 6407, along with the decision of the Supreme Court in *United States v. Swift and Co.*, 282 U.S. 468 (1931). Defendant's position not only misrepresents the pertinent facts and the holding of the *Swift* case, but it also misapplies 26 USC § 6407 to the case at hand. Moreover, as will be explained below, the Defendant's current position is in conflict with its original position taken in its Motion to Dismiss.

In *United States v. Swift & Co.*, 282 U.S. 468 (1931), the Internal Revenue Service's ("IRS") procedures were much different than the procedures currently used by the IRS in transferring overpayments from one taxable year to a tax deficiency year. In *Swift*, the Commissioner applied an overpayment from a later year as a credit to the 1917 taxable year for income and excess profits taxes. The applicable statute, Section 284(b)(1) of the Revenue Act of 1926, stated that "No such credit or refund shall be allowed or made after . . . four years from the

time the tax was paid . . . unless before the expiration of such period a claim therefor is filed by the taxpayer." *Swift & Co.*, 282 U.S. at 470. As noted by the Supreme Court, "the [taxpayer] was required to file its claim within four years from the date of the allowance of the credit." *Swift & Co.*, 282 U.S. at 470. The taxpayer argued that the credit was allowed when the Commissioner "certified the overassessment," but the Commissioner of the Internal Revenue believed that the credit was allowed when he signed the "schedule of refunds and credits." Set forth below is a summary of the three steps used by the IRS in the *Swift* case:

> Step 1: Examine taxpayer's return, and if it disclosed an overassessment, to prepare for the Commissioner a certificate of overassessment. When the Commissioner had accumulated a number of such certificates with respect to taxpayers in a single district, a form called a "schedule of overassessment" was prepared. On this schedule was noted the overassessment and blanks were left for further entries by the Collector of the district. To it was attached a subsidiary schedule, called a schedule of refunds and credits, on which the Collector should make a report of his actions pursuant to the schedule of overassessments. In the instructions provided to the Collector, the Collector was advised to examine all accounts of the taxpayer and apply such overpayment as a credit against the tax owing. The balance (if any) of the overpayments shall be placed upon a schedule of refunds.
>
> Step 2: The Collector would then determine the application of the overpayment to credits for other taxable years and/or refunds of the overpayment. The Collector would complete the subsidiary schedule of refunds and credits and would certify the correctness of these schedules. Upon completion, the Collector would return these documents to the Internal Revenue in Washington.

Step 3: The Collector's schedules and certificate were examined by the Deputy Commissioner to determine if they were correct and forwarded by him to the Commissioner of Internal Revenue, and the Commissioner would certify the schedule of refunds and credits.

The Supreme Court in its holding explained that "the schedule of overassessment" (Step 1) by the Commissioner was not the payment date because, at the time of execution, the Commissioner had no knowledge as to whether the overassessment would be entirely used up in abatements or whether, if any overpayment was shown, it would have to be apportioned partly as a credit and partly as a refund. *Swift* 282 U.S. at 475. The Supreme Court explained further that "[the Commissioner's] approval of the schedule of refund and credits must be taken to be the final exercise of that discretion and the allowance of the credit. This construction of the act brings about uniformity in administration as it makes the allowance of refunds and credits simultaneous." *Swift* 282 U.S. at 476. Thus, the payment date was when Step 3 above was completed.

Defendant argues at page 5 of its April 26, 2006 Reply that the Supreme Court in its decision "concentrates on determining on what date the overpayment was authorized [Step 1], not on what date it was recorded." Defendant's position is wrong. The Supreme Court did not find that the authorization of the overpayment (Step 1) as being the date the payment of tax is made. As explained by the Supreme Court, that date was premature because at that time the Commissioner was unaware as to how the overpayment would be applied. It is only when the Commissioner has approved the "schedule of refunds and credits," (Step 3) which details the application of credits to specific years and any remaining refund which will be issued to the

taxpayer, will the final step have been completed by the Commissioner, and this will constitute the payment date for the credits allocated to certain years.

Although the procedures used today by the IRS have changed, the logic followed in the *Swift* decision continues to support the Plaintiff's position that the payment date for a credit from an overpayment does not arise until the credit is transferred and applied to the applicable year. As in *Swift*, when the "schedule of overassessment" takes place, neither the IRS nor the taxpayer is certain as to how, or to what tax years, the overpayment will be applied. It is only when the credits are transferred from the overpayment tax year and applied as payments to the tax deficiency years will there be a "final exercise of that discretion [by the Commissioner] and the allowance of the credit." *Swift* 282 U.S. at 476. Any other conclusion would be illogical since there cannot be a "payment" of tax until the overpayment is transferred to another year and used to offset an outstanding tax deficiency.

In its Reply, dated April 26, 2006, the Defendant relies on two statutes, 26 USC § 7422(d) and 26 USC § 6407. 26 USC § 7422(d) provides:

> The credit of an overpayment of any tax in satisfaction of any tax liability shall, for the purpose of any suit for refund of such tax liability so satisfied, be deemed to be a payment in respect of such tax liability at the time such credit is allowed.

26 USC § 6407 provides:

> The date on which the Secretary first authorizes the scheduling of an overassessment in respect of any internal revenue tax shall be considered as the date of allowance of refund or credit in respect of such tax.

The legislative history of 26 U.S.C. § 6407 (which dates back to the Revenue Act of 1932) explains the purpose of the section and how it operates. In Section 1104 of Conference Committee Report (72d Cong. 1st Sess. H. Rept. 1492), the Committee explained that the "schedule of overassessment" includes the application and credits of overassessment (Steps 2 and 3) as a part of the date of allowance of refund or credit in respect of such tax as follows:

> Under the practice once prevailing in the Bureau of Internal Revenue the commissioner first signed a schedule of overassessments, which fixed the amount of the taxpayer's overassessment, and later, after the collector had made appropriate adjustments to the taxpayer's account in accordance with this schedule, signed a schedule of refunds and credits, which formally approved the action so taken and directed the making of any money payments due the taxpayer. In recent years the schedule of refunds and credits has been abandoned; the commissioner's final action consists in signing the schedule of overassessments, which in itself contains complete directions as to the further steps to be taken toward abating, crediting, or refunding the overassessments entered on the schedule.

The Committee Report explains that the IRS, during the relevant timeframe, modified its procedures from a three-step process, as identified above in the *Swift* case, to a one-step process where the "schedule of overassessment" was the final action of the Commissioner.

For the years involved in this proceeding (1987 and 1988), however, the "scheduling of an overassessment" was *not* the final action taken by the IRS. The IRS still had to apply the credit from the overpayment year (1988) to the tax deficiency year (1987). In the present case, it is only after the credit was applied from the 1988 tax year to the 1987 tax year (to offset the outstanding tax deficiency for 1987) that the IRS completed the final step in the process. A decision of this Court and the decisions of other courts, as well as the IRS's administrative position, support Plaintiff's interpretation of 26 USC § 6407.

In *Donahue v. United States*, 33 Fed. Cl. 600, the Internal Revenue Service, on July 31, 1989, transferred credits totaling $7,745.51 from taxpayer's 1988 tax overpayment to his outstanding 1985 tax, interest and penalty liability. In the case, this Court held that:

> Because Plaintiff satisfied his 1985 tax deficiency on the date the IRS credited plaintiff's reported 1988 tax overpayment against his 1985 deficiency, "the time the [1985] tax was paid" for purposes of section 6511(a) is the date of the credit, July 31, 1989.

As held by this Court in *Donahue*, it is the crediting of the overpayment against the applicable deficiency year which constitutes the payment date when there is an overassessment being

applied as a credit from one taxable year to another taxable year. This result is consistent with both the holding in *Swift* and with the purpose behind 26 U.S.C. § 6407 as stated in the legislative history. Other courts also have held that the critical date in determining when a credit is considered paid is the date the overpayment is applied or credited to the tax deficiency year. *Newman v. United States*, 78-1 USTC ¶ 9116 (S.D. Ohio 1977) (Section 6407 and 7422(d) make it clear that the critical date in determining the payment date is the date the overpayments are credited); *Fitzmaurice v. United States*, 81 F.Supp. 2d 741 (S.D. Texas 1999) (The critical question is whether *Fitzmaurice* filed an administrative claim with the IRS within two years from the date the IRS credited portions of his 1985 overpayment to satisfy his 6672 penalty for payroll period December 31, 1983); *Kaffenberger v. United States*, 314 F.3d 944 (8th Cir. 2003) (The overpayments became credits against the 1990 tax liability when the IRS so applied them) and *Republic Petroleum Corp. v. United States*, 613 F.2d 581 (5th Cir. 1980) (See Defendant's Motion to Dismiss, page 5, footnote 4). Moreover, the IRS has applied this standard in the issuance of Priv. Ltr. Rul. 97020002.[1] By comparison, in cases such as *General Instrument Corporation v. United States*, 33 Fed. Cl. 4, where the case involves only a refund in the year of the overpayment and no credit is applied to other years, it is appropriate to treat the scheduling of the overassessment as the payment date since this is the final action taken by the IRS.

Finally, the holdings of the courts in the *Donahue, Newman, Fitzmaurice, Kaffenberger* and *Republic Petroleum* cases are consistent with the position originally taken by Defendant in its Motion to Dismiss. Of course, Defendant took that position before it realized that such a position results in the payment date being March 1, 1999 – as Plaintiff has asserted all along. As

[1] Private Letter Ruling 97020002 is not cited as precedent but, rather, as evidence of the IRS's administrative position with respect to the application of credits as payments. See 26 U.S.C. § 6110(k)(3).

stated by Defendant in its Motion to Dismiss at page 5, footnote 4, "the date of the credit made to the 1987 account is considered the payment date."

C. Defendant has not proven that a Form 2188 was executed on February 22, 1999.

Defendant asserts that the date on which IRS Form 2188 is executed determines the date of allowance of overpayment. Even if the date on which the execution of a Form 2188 were relevant to the date on which the credit from Plaintiff's 1998 tax year were applied as a payment to the 1987 tax year, Defendant has not proven that the Form 2188 was executed on February 22, 1999. The Defendant concedes that it destroyed the Form 2188. (Affidavit of Marlene F. Hainley, page 5, Exhibit of Defendant's Reply). However, Defendant argues that it can establish the date on which the Form 2188 would have been signed through "normal course" of conduct. *See* Defendant's Reply at page 9.

Although it is true that in certain situations the courts will permit the IRS to prove the content of a destroyed document (such as Form 2188) through circumstantial evidence of the normal practices of the IRS, *See Id*.; *Randle v. United States*, 2000 US. Dist. LEXIS 13591, at 30 – 32 (U.S. Ctr. Dist. CAL 2000), the presumption of regularity does not automatically attach to IRS employees' conduct in assessing and collecting taxes (Reply Brief at 9 fn. 9). Rather, the presumption of regularity attaches *only after* "the IRS has established an administrative procedure that its employees *must* follow in the course of their official duties." *Randle*, 2000 US. Dist. LEXIS 13591, at 32 – 33; *see also Cross v. United States*, 1995 U.S. Dist. LEXIS 20308, 1995 WL 835380, at *7; *Malkin v. United States*, 2000 U.S. Dist. LEXIS 365, *8, 2000 WL 37996, at *2 ("since the procedures outlined by the Government mandated the entry into a computer record of various taxpayer transactions, we presume that IRS employees entered such data as required, and hence that a computer-generated transcript of such taxpayer record,

certified as authentic by the agency, is in fact accurate"). *See also Lewis v. United States*, 279 U.S. 63, 73, 49 S. Ct. 257, 73 L. Ed. 615 (1929). In this regard, the IRS has failed to meet its burden. Specifically, at page 9 of its Reply, Defendant states:

> [B]ased upon the automatic data processing systems in place during 1999, the entry of the abatement request into IDRS on February 4, 1999, in the normal course, would have automatically generated a Form 2188 during the posting cycle 9906. Hainley Affidavit ¶10. The Form 2188 generated during the posting cycle would have been pulled on February 18 [*sic*], 1999, and would have been signed by a certifying officer on the following Monday, February 22, 1999. Hainley Affidavit ¶10.

Despite its conjecture regarding the date of the execution of the Form 2188, Defendant has failed to direct Plaintiff and this Court to any administrative procedure requiring the certifying officer to sign the Form 2188 on the business day following the date on which the Form 2188 is pulled. In other words, Defendant alleges that the Form 2188 would have been pulled on February 19, 1999, which was a Friday, and that it would have been signed on Monday, February 22, 1999. However, Defendant points to no procedural requirement that this be accomplished. In fact, Defendant's suggestion that the Form 2188 would have been promptly executed by the certifying officer on Monday February 22, 1999, is nothing more than speculation and conjecture. Such speculation certainly does not rise to the level of a "presumption of regularity."

Moreover, paragraph 10 of the Hainley Affidavit, which states that the Form 2188 would have been pulled on February 19, 1999, and signed on February 22, 1999, is not based upon personal knowledge and does not meet the threshold standard for admissibility. It is a basic tenet of the rules of evidence that a lay witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the testifying witness has personal knowledge of the matter. Fed. R. Evid. 602; *Boston Edison Company v. United States*, 64 Fed. Cl. 167, 181

(Ct. Cl. 2005); *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990). Personal knowledge is knowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said. *Cuyahoga Metropolitan Housing Authority v. United States*, 60 Fed. Cl. 481, 482 (Ct. Cl. 2004). In other words, a witness may only testify as to what he actually perceived through one or more of his senses. Fed. R. Evid. 602. Unless otherwise established by extrinsic evidence, the witness' testimony must establish that the witness was in a position to see or otherwise perceive the matters to which he has testified or will testify. *Boston Edison Company*, 64 Fed. Cl. at 181.

Affiant Hainley makes representation regarding what ACO Operation Manager Beverly S. Nadermann (*i.e.*, the certifying officer) would have done and when she would have signed the Form 2188. However, beyond her personal observations, Ms. Hainley is incompetent to testify as to what would, could, or should have been done with Form 2188. According to the Hainley Affidavit, Ms. Hainley was employed by IRS in 1999, the relevant time period, as a "technician" in the Internal Revenue Accounting Control System ("IRACS"). However, there is no indication of what Ms. Hainley's duties or responsibilities were at any point during the time period that is the subject of the Hainley Affidavit. Likewise, there is no indication that the IRS had an established administrative procedure that its employees, including Ms. Nademann, were required to follow in the course of their official duties with respect to processing and signing Form 2188. Nothing in the Hainley Affidavit suggests that Ms. Hainley had any role or familiarity whatsoever in the process associated with "pulling" and "signing" Form 2188. Nothing in the Hainley Affidavit suggests that Ms. Hainley had the opportunity to personally observe any of the events set forth in Paragraph 10. The statements that Form 2188 would have been "pulled" on February 18, 1999 and "signed" on February 22, 1999 are not based on personal knowledge and

there is absolutely no foundation for these statements, whatsoever. These statements amount to nothing more than arguments and legal conclusions disguised as facts in an affidavit. (Hainley Aff. ¶ 10). Accordingly, Paragraph 10 of the Hainley Affidavit should not be considered by this Court.

If Defendant wishes to establish the practices of Beverly S. Nadermann with respect to the execution of Forms 2188, it should have obtained the affidavit of Ms. Nadermann. However, even if it were to obtain the affidavit of Ms. Nadermann, such testimony still would not establish an administrative procedure requiring that the Form 2188 be signed on any particular date for purposes of establishing a "presumption of regularity." Accordingly, the IRS's claim that Plaintiff's refund suit is barred by the statute of limitations must be denied.

Dated: May 10, 2006

PARKER HANNIFIN CORPORATION
By its attorney,

/s/ William R. Stewart

William R. Stewart (0010680)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: 216-566-5580
Facsimile: 216-566-5800

Of counsel:

/s/ Jeffry J. Erney

Jeffry J. Erney (0040193)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: 216-566-5831
Facsimile: 216-566-5800

11185846.4